IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEVIN J. JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 13-233-SLR |
| | ) |
| OFFICER GULA, et al., | ) |
| | ) |
| Defendants. | ) |

Kevin J. Jackson, Wilmington, Delaware. Pro se plaintiff.

Christofer Curtis Johnson, Esquire, City of Wilmington Law Department, Wilmington, Delaware. Counsel for defendants.

**MEMORANDUM OPINION**

Dated: January 29, 2016
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Plaintiff Kevin J. Jackson ("plaintiff") filed this lawsuit alleging violations of his constitutional rights.[1] He proceeds pro se and has been granted leave to proceed in forma pauperis. Before the court is defendants' motion for summary judgment and plaintiff's opposition thereto. (D.I. 131, 132, 133, 134, 135) The court has jurisdiction pursuant to 28 U.S.C. § 1331. For the reasons discussed, the court will grant the motion for summary judgment.

## II. BACKGROUND

Plaintiff alleges that defendants Wilmington Police Officers Gula ("Gula"), Fossett ("Fossett"), Vignola ("Vignola"), Moore ("Moore"), Puit ("Puit"), Prado ("Prado"), and Satterfield ("Satterfield") (collectively "defendants") violated his Fourth Amendment rights when they used excessive force during plaintiff's arrest on February 26, 2011. The amended complaint alleges that Gula used excessive physical force when he tased plaintiff, that Gula and Fossett picked plaintiff up by the legs and threw him face first onto the ground and tased him again, and that Puit, Moore, Prado, Ball, Satterfield, and Vignola assisted Gula and Fossett in punching, kicking, and stomping plaintiff's face, head and body for "what seemed to be about two minutes before plaintiff fell completely unconscious." (D.I. 104, ¶¶ 16-21)

On February 26, 2011, Gula, Vignola, Fossett, and Satterfield were assigned to the community policing unit. (D.I. 133 at A-1, A-4, A-7) The officers were in an unmarked Chevrolet Tahoe and wore tactical uniforms with "POLICE" displayed on the

---

[1] Plaintiff was incarcerated at FCI-Cumberland in Cumberland, Maryland when he initiated this lawsuit. He has since been released.

front, back and sleeves. (*Id.* at A-1) As the Tahoe approached the intersection of West 5th Street and North Franklin Street in Wilmington, Delaware, the officers noticed a group of males on the corner of the intersection. (*Id.* at A-2) The area is known as a high crime area, and defendants decided to speak to the group of men about loitering. (*Id.* at A-5, A-8) Gula, Fossett, Vignola, and Satterfield left their vehicle, approached the men, identified themselves as Wilmington police officers, and plaintiff walked away headed southbound in the 400 block of North Franklin Street. (*Id.* at A-2, A-5, A-8, A-65)

Gula, Fossett, and Vignola chased plaintiff and each identified themselves to plaintiff as a police officer.[2] (*Id.* at A-2, A-5, A-8) Plaintiff testified that he heard an officer say "stop," but did not stop because he did not know if the officer was talking to him, and he did not know who said it because he never turned around. (*Id.* at A-65) While chasing plaintiff, Vignola saw plaintiff reach into his waistband and toss a handgun onto the sidewalk. (*Id.* at A-8) Plaintiff acknowledged that he did not want to get caught with a gun, pulled the gun out, placed it on the "floor," and kept walking. (*Id.* at A-65, A66) Gula, who was pursuing plaintiff, heard Vignola yell "gun!" (*Id.*) Vignola stopped pursuing plaintiff and remained with the weapon. (*Id.*)

Gula continued to chase plaintiff, ordered him to stop, and warned plaintiff he would be tased if he did not comply. (*Id.*) Plaintiff continued to flee and, according to Gula, he deployed his department issued electronic control deviser one time, with a five-

---

[2]Satterfield did not pursue plaintiff, lost sight of him as he turned onto the 1100 block of West 4th Street and, when Satterfield next saw plaintiff, he was lying in a prone position, restrained by handcuffs. (*Id.* at A-19)

second cycle, from a distance of approximately fifteen feet. (*Id.* at A-2, A-3) Gula explained that he deployed the taser because plaintiff was not responding to officer presence or verbal commands and his concerns for safety escalated as did his concern that plaintiff might escape. (*Id.* at A-2) The taser deployed two prongs and plaintiff was struck on the left side of his torso and face. (*Id.* at A-3, A-5) At that point, plaintiff stopped running and fell face first into the ground. (*Id.* at A-3, A-5)

According to Gula, he deployed his taser one time. (*Id.* at A-3) Fossett saw Gula deploy the taser, and Vignola heard Gula deploy the taser. (*Id.* at A-5, A-8) The other officers present did not deploy their tasers. (*Id.* at A-3, A-5 A-8, A-39, A-40, A-43, A-46) As Fossett approached plaintiff, he realized that plaintiff was unconscious. (*Id.* at A-5) When Gula and Fossett handcuffed plaintiff, they noticed that plaintiff had suffered injuries to his head and/or face, and they called for medical aid. (*Id.* at A-3, A-5) According to Vignola, Gula, and Fossett, neither Vignola nor Satterfield had any physical contact with plaintiff. (*Id.* at A-3, A-5, A-8) According to Gula, at no time did any officer strike or kick plaintiff. *(Id.* at A-3) During the pursuit, the officers did not know who plaintiff was, whether he had a record, whether he was wanted on any outstanding warrants, whether he was intoxicated, or whether he was carrying additional weapons. (*Id.* at A-2)

Plaintiff was treated at the scene by paramedics before he was transferred to Christiana Hospital where he remained until March 2, 2011 when he was discharged into the custody of the police. (D.I. 4 at 1; D.I. 133 at A-21) The Wilmington Police Department reported to medical personnel that plaintiff was running in a foot chase, struck with a taser, fell face down on a sidewalk, and lost consciousness when he fell.

3

(D.I. 4 at 23, 27) When medics arrived at the scene, plaintiff was awake, alert, and combative. (*Id.* at 27)

Hospital records describe that plaintiff was injured when he was "allegedly running from police. pt. jumped in air & was tased, barbs removed from body while in trauma bay. Pt. landed face first onto asphalt and skidded across asphalt for a short distance." (*Id.* at 35) Examination revealed plaintiff sustained a through-and-through laceration of the upper lip, an abrasion of the forehead, loose teeth, and a laceration of the chin. (*Id.* at 3) A CT of the head showed no intracranial hemorrhage or fracture, a CT of the cervical spine was within normal limits, and a CT of the face and orbits showed bilateral nasal bone fractures and a chronic fracture of two teeth. (*Id.*) Laboratory testing revealed an alcohol level of 80 and that plaintiff was positive for PCP. (*Id.*)

On June 30, 2011, plaintiff filed a complaint with the Wilmington Police Department. (D.I. 133 at A-19) The Wilmington Police Department Office of Professional Standards investigated whether Gula's use of force violated Wilmington Police Department Directive 6.7(B)(2)(b). (*Id.* at A-13-18, A-53-63) Master Sergeant Paul Reutter ("Reutter"), who conducted the investigation, interviewed plaintiff by telephone.[3] (*Id.* at A-10, A-11) Plaintiff told Reutter that he had no personal knowledge about his arrest because he was unconscious and that his complaint that he was tased twice is based upon information he received from medical personnel at St. Francis Hospital and/or an EMS report. (*Id.* at A-11, A-69)

---

[3] Reutter also interviewed plaintiff's girlfriend and his defense counsel, as well as Gula, Fossett, Vignola, and Satterfield. (*Id.* at A-11)

4

Reutter reviewed the medical records and, in particular, the EMT report which refers to "4 tazer [sic] probes were noted in various locations on pt. WPD advised that pt had been successfully tazed [sic] one time," as well as a later note in the same report that details discovery of two taser probes, one in the head and one in the posterior thorax. (D.I. 4 at 27; D.I. 133 at A-11) Reutter also reviewed the physical evidence recovered at the scene which consisted of one taser cartridge with the corresponding wire and two probes and the reports of all taser deployments from the officers at the scene. (*Id.*) The reports indicate that only Gula's taser was deployed during the encounter with plaintiff. (*Id.*) Reutter concluded that plaintiff's claims of excessive force were unsubstantiated. (*Id.* at A-12)

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56 on the grounds that: (1) Gula, Fossett, and Vignola are entitled to qualified immunity; (2) plaintiff cannot establish that Gula used excessive force; (3) all force based claims against Gula fail on their merits; and (4) plaintiff cannot establish that force of any kind was used by Fossett, Vignola, Moore, Puit, Ball, Prado, and/or Satterfield. Plaintiff opposes the motion and appears to argue there remain genuine issues of material fact.

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be--or, alternatively, is--genuinely disputed must be supported either by citing to

5

"particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The judge must ask not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Id.* at 252. The court must not engage in the making of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" as these "are jury functions, not those of a judge, [when] [] ruling on a motion for summary judgment." *E.E.O.C. v. GEI Group, Inc.*, 616 F.3d 265, 278 (3d Cir. 2010) (citation omitted).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. at 247-48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV. DISCUSSION

Defendants argue that they are entitled to qualified immunity and that plaintiff cannot establish that the force used by Gula constituted a violation of the Fourth Amendment or that Gula's use of force was unreasonable given the circumstances he confronted. In addition, defendants argue that plaintiff has not produced any credible evidence that, other than Gula, the remaining defendants applied force of any kind.

Under certain circumstances, government officials are protected from § 1983 suits by qualified immunity. The doctrine of qualified immunity serves to protect officers from civil liability "when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Accordingly, it gives "ample room for mistaken judgments,"

*Hunter v. Bryant*, 502 U.S. 224, 229 (1991), whether the official's mistake is a mistake of fact, mistake of law, or mistake based on mixed questions of fact and law, *Pearson*, 555 U.S. at 231. In the context of Fourth Amendment claims, qualified immunity operates to "protect officers from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (internal citation omitted)).

The court makes two inquiries when analyzing qualified immunity. Under the constitutional inquiry, the court examines "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (citation omitted). Second, the court inquires "whether the right at issue was 'clearly established' at the time of a defendant's alleged misconduct." *Id.* Courts have the discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. *Pearson*, 555 U.S. at 236.

"[C]laims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard. . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397; *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004); *Mosley v. Wilson*, 102 F.3d 85, 95 (3d Cir. 1996).

8

While the inquiry is highly individualized and fact specific, the Supreme Court has provided three factors for consideration: (1) the severity of the crime at issue; (2) whether the suspect posed an imminent threat to the safety of the police or others in the vicinity; and (3) whether the suspect attempted to resist arrest or flee the scene. *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015) (citing *Graham*, 490 U.S. at 396); *see also Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) (providing additional factors including "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time"). A court must judge the reasonableness of particular force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Because the determination of whether the use of force is reasonable is a fact specific inquiry, courts have reached different results depending upon the facts and circumstances of each case. *See Bender v. Township of Monroe*, 289 F. App'x 526 (3d Cir. 2008) (unpublished) (genuine issues of material fact precluded summary judgment on whether police officers retaliated and used excessive force against an arrestee by beating him while handcuffed, hitting him in the face with a flashlight, and breaking his cheekbone, because arrestee had kicked an officer); *Davis v. Bishop*, 245 F. App'x 132 (3d Cir. 2007) (unpublished) (no excessive force by police officers in handcuffing and subduing arrestee who was intoxicated, disobeyed officer's orders to attempt to perform a field sobriety test and get off the hood of the police car, and eventually kicked out the

9

rear window of the police cruiser; although officer admitted to having flung arrestee off the car, officers were confronted with an uncertain situation with an individual who was uncooperative); *Feldman v. Community Coll. of Allegheny*, 85 F. App'x 821 (3d Cir. 2004) (unpublished) (no excessive force by police officers when arresting college student even if, as student alleged, the officers wrestled student to the ground and kicked him in the head, when the student resisted arrest and actively struggled with the officers when they attempted to remove him); *Ankele v. Hambrick*, 2003 WL 21223821 (E.D. Pa. May 7, 2003), *aff'd*, 136 F. App'x 551 (3d Cir. 2005) (unpublished) (show of force of slamming plaintiff onto hood of patrol car reasonable given the uncertainty presented by the arrestee's conduct).

The court construes all facts and inferences in favor of plaintiff, the nonmoving party. In his opposition, it appears that plaintiff attempts to create issues of fact by referring to different times provided in a defensive tactics report and supplemental report, service report, audio dispatch, officers' reports, and EMS reports, as a means to question the credibility of Defendants and their version of the events on February 26, 2011. (D.I. 134) Plaintiff also seems to argue that the EMS report stating there were four taser prong marks on his body is evidence that he was tased twice. Plaintiff also refers to the injuries he sustained.[4]

A reasonable jury could find that the severity of crime factor weighs in defendants' favor. The community policing unit was patrolling a high crime area police

---

[4]Although plaintiff sustained serious injuries, it cannot be said that Gula expected deployment of the taser would cause plaintiff to fall flat on his face and sustain the injuries he did. Notably, medical records indicate that testing at the time of arrest revealed alcohol and PCP in plaintiff's system.

10

and was not there as a result of any sort of criminal activity on the part of plaintiff. Nonetheless, when plaintiff saw defendants he walked away from them because he was a convicted felon in possession of a gun, and he knew that he was "breaking the law." (D.I. 133 at A-66)[5] Plaintiff admitted that he placed the gun on the street because he did not want to get caught with it. (*Id.*)

In addition, a reasonable jury could find that the imminent threat factor weighs in defendants' favor. Plaintiff admits that he ignored police officer commands to stop, continued walking away from defendants, and discarded his weapon. That plaintiff ignored police commands, that he had a weapon, that he was seen discarding the weapon, and that he admits he did so, compels the court to find against plaintiff. In addition, because plaintiff had at least one weapon, a jury could find that an objectively reasonable officer may have believed that plaintiff was in possession of other weapons. The final *Graham* factor, whether the suspect attempts to resist arrest or flee the scene, also weighs in favor of defendants. Plaintiff testified that he initially ignored requests to stop because he did not know if the commands were directed to him. Accepting the truth of plaintiff's testimony, it remains undisputed that he continued to ignore commands to stop after he discarded the gun and was warned he would be tased. In addition, plaintiff admitted during his plea colloquy that he ran from the police officers. (*See United States v. Jackson*, Crim. No. 11-054-RGA at D.I. 26 at 12-14) Even when construing all facts and inferences in plaintiff's favor, no reasonable juror could find that

---

[5]Plaintiff pled guilty to one count of unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) and was sentenced to thirty-seven months imprisonment, affirmed on appeal. *See United States v. Jackson*, 499 F. App'x 172 (3d Cir. 2012) (unpublished).

11

defendants' actions were not objectively reasonable, given that plaintiff fled from the police officers, ignored police commands to stop, discarded a weapon, and was tased only after he was warned that if he did not stop he would be tased.[6]

Keeping in mind that "police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation," the court concludes that Gula used reasonable force to gain control of the situation (whether or not plaintiff was tased once or twice as plaintiff alleges).[6] *See Graham*, 490 U.S. at 397. Therefore, the court finds that any force that may have been applied does not rise to the level of a constitutional violation and that Gula is entitled to qualified immunity.

With regard to the remaining defendants, there is no evidence of record that they used force of any kind against plaintiff. Although plaintiff attempts to create an issue of fact through the use of the variance in times in numerous reports, there is no indication that the reporting individuals had synchronized timepieces and the court finds the differences in time insignificant. In addition, plaintiff did not present any evidence to refute the affidavits of Gula, Vignola, and Fossett that no force was used other than

---

[6]The court reviewed the medical records and found nothing to indicate that plaintiff suffered injuries anywhere other than to the front of his body, consistent with plaintiff landing face first on the ground.

[6]Plaintiff relies upon the EMS report, that refers to 4 taser probes, to support his theory that he was tased twice. However, the report also states that a taser probe was found in his head and his thorax, consistent with the Gula's affidavit that his device deployed two prongs; one that struck plaintiff in the left side of his torso and one that struck plaintiff's face. In addition, taser reports reflect that only Gula deployed his device and that it was only deployed once. Based upon the facts, a jury could reasonably find that plaintiff was only tased once.

12

when Gula tased plaintiff. There being no genuine issues of material fact, no reasonable jury could find for plaintiff on the excessive force claims raised against Fossett, Vignola, Moore, Puit, Ball, Prado, and Satterfield as there no evidence of record these defendants used any type of force.

For these reasons, the court will grant defendants' motion for summary judgment.

## V. CONCLUSION

For the reasons discussed, the court will grant defendants' motion for summary judgment. (D.I. 131) An appropriate order will be entered.